**IN THE UNITED STATES DISTRICT COURT**
**OR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| REPUBLIC MAXIMAL LLC, *et al.*,<br><br>*Plaintiffs*,<br>v.<br><br>ROMULUS CAPITAL PARTNERS II, LLC, *et al.*,<br><br>*Defendants.* | Civil Action No. 1:22-cv-10429 |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SANCTIONS FOR FRAUD ON THE COURT**

Plaintiffs,[1] by and through undersigned counsel and pursuant to this Court's inherent authority to address serious abuses of the judicial process, submit this Memorandum in support of their Motion for Sanctions Against Defendants Romulus Capital Partners II, LLC ("Romulus") Neil Chheda (collectively with Romulus, the "Romulus Defendants") Athena2, Inc. ("Athena"), SNC 1, LLC ("SNC") and Apollo 1, Inc. ("Apollo" and collectively with Athena and SNC, the "Transferors") for Fraud on the Court ("Motion").

## INTRODUCTION

Defendant Neil Chheda and his father, Dr. Vasant Chheda, are serial fraudsters who defrauded Plaintiffs out of more than $100 million in a series of five securities transactions

[1] Plaintiffs are Plaintiffs Republic Maximal LLC, Republic Master Fund, LP, EquipmentShare Growth One, LP, EquipmentShare Growth Two, LP, EquipmentShare Growth Three, LP, EquipmentShare Romulus Close Two, LP, EquipmentShare Secondary One, LP, EquipmentShare Secondary Two, LP, EquipmentShare Secondary Three, LP, EquipmentShare Secondary 2020, LP, EquipmentShare Secondary II, LP, EquipmentShare Secondary III, LP, EquipmentShare Qualified 2020, LP, EquipmentShare Qualified 2020 II, LP, EquipmentShare Qualified 2020 III, LP, and EquipmentShare Qualified 2020 IV, LP (collectively, "Plaintiffs").

between September 2019 and November 2020. But their lies and schemes did not end there. The recent depositions of Neil and Vasant revealed that they have perpetrated a fraud upon this Court in two separate but equally insidious ways, both intended to unfairly obstruct Plaintiffs' ability to present and prosecute their claims and to interfere with this Court's ability to impartially decide this dispute on the merits. The only conceivable reason for their duplicity was to deceive Plaintiffs in the underlying transactions and thereafter gain an unfair advantage in this litigation.

*Neil and Vasant Forge the Transferors' Signatures on the Transfer Agreements and Destroy Evidence to Cover Their Tracks*

The five securities transactions at the center of this case involve twenty-one separate Limited Partner Transfer and Substitution Agreements ("Transfer Agreements") signed by the Transferors, corporate entities used to conceal Vasant's involvement. But someone still had to sign the Transfer Agreements on behalf of those entities. That was a problem for Neil and Vasant's scheme because Vasant is the sole owner, officer, and director of the three Transferors – and, therefore, the only person with legal authority to sign on their behalf. To ensure that no one else knew Vasant was the real party in interest to the fraudulent transactions, Neil and Vasant decided to purportedly "designate" four individuals as "signatories": (i) Vasant's sister-in-law, Pushpa Shah; (ii) Vasant's brother-in-law, Dhiraj Shah aka Dhiraj Dedhia; (iii) Vasant's deceased brother-in-law, Hitendra Dedhia; and (iv) Dhaval Lalan, a friend of Vasant's deceased mother (collectively, the "Sham Signers"). All four "signatories" are or were located in India and had nothing to do with the transactions or the Transferors. Moreover, documents produced by Defendants, deposition testimony from Neil and Vasant, and the evaluation of an expert forensic document examiner uniformly corroborate and confirm that none of the Sham Signers actually signed a single Transfer Agreement. Neil and Vasant forged the signatures of the Sham Signers

on all twenty-one of them, thereby committing twenty-one independent violations of the Exchange Act and Rule 10b-5 within the four corners of the Transfer Agreements.

As evidence of the forgery, Neil and Vasant both testified – *incredibly* – that they are "unable to locate" *any* documents showing the transmission of the Transfer Agreements to or from any of the four Sham Signers. Those transmission documents could not be located because they do not exist. Stated another way, there is no evidence that Vasant or Neil sent the Transfer Agreements to the Sham Signers for signature, and no evidence that the Sham Signers sent executed copies back. Interestingly, some of the Transfer Agreements have purported wet ink signatures of Pushpa Shah, Dhiraj Shah, and Dhaval Lalan. And while Neil and Vasant both claimed they failed to preserve the original wet ink documents, Neil admitted that he possessed, at some point in time, original copies of Transfer Agreements bearing Dhaval Lalan's purported signature in ink. Had Neil preserved, and not destroyed, those wet signature original documents, Plaintiffs would have had the opportunity to have a handwriting expert examine those original documents and confirm that Vasant forged Mr. Lalan's signature. Indeed, with just the electronic copies, a handwriting expert retained by Plaintiffs confirmed that the handwriting beneath each of the wet ink signatures belongs to the same person – Vasant Chheda. In addition, there are two sets of the Transfer Agreements purportedly signed by Ms. Shah on behalf of Athena, one in wet ink and one electronic. The only plausible explanation for that fact, supported by documents produced by Defendants, is that Neil and Vasant separately forged her signature while in a hurry to get an executed copy to Plaintiffs. The prejudice to Plaintiffs from Neil and Vasant's willful destruction of evidence of their obvious forgeries can only be remedied by a jury instruction that Neil and Vasant collaborated to forge the signatures of the Sham Signers on all twenty-one Transfer Agreements relevant to this case.

*The Romulus Defendants' Systemic False Representations about "Sarah Williams," Neil Chheda's Pseudonym*

In addition to forging the Transferors' signatures on all of the Transfer Agreements, the Romulus Defendants have made multiple knowingly false representations to this Court and Plaintiffs about "Sarah Williams," a purported "former, unpaid intern" at Romulus who sent emails containing four of the five key extra-contractual fraudulent representations Plaintiffs allege in their complaint. No such person exists. Neil set up a "SWilliams@romuluscap.com" email account and used it, pretending to be Sarah Williams. Neil would bring "Sarah" into email conversations, ask her questions, and then "she" would respond while copying Neil. He used this sham email account to mislead Plaintiffs and this Court by pretending that a nonexistent intern authored fraudulent representations that induced Plaintiffs to purchase limited partnership interests ("LP Interests") from the Transferors. Despite knowing that Sarah Williams does not exist, the Romulus Defendants repeatedly made false representations about "her" and the use of the SWilliams@romuluscap.com email address during this case to obstruct Plaintiffs' ability to conduct discovery and learn the truth.

First, in their answer, the Romulus Defendants represented to this Court and Plaintiffs twenty-three separate times that Sarah Williams was "a former unpaid intern at Romulus," and sent the key emails Plaintiffs describe in their complaint. Next, in response to Plaintiffs' efforts to contact Sarah Williams and learn more about the fraud, the Romulus Defendants claimed that the SWilliams@romuluscap.com email address was used by unspecified "unpaid interns and/or offshore service providers," while claiming to have no contact information for any of them. Later, the Romulus Defendants attempted to blame their lack of transparency on non-parties that worked at Romulus before Neil joined. Plaintiffs only discovered the truth—that Sarah Williams is not a real person and that Neil impersonated her—after contacting counsel for non-party Krishna Gupta,

the original founder of Romulus, and after Defendants and their counsel failed to offer any clarity on this seemingly simple issue for over a year. Because Neil learned before his deposition that Plaintiffs had discovered the truth, he begrudgingly admitted in his deposition that he does not know anyone named Sarah Williams, that he does not know anyone else who used the SWiliiams@romuluscap.com email address, and that he "may have" sent the emails signed with her name (often with the email sign-off, "Warm Regards, Sarah"). Had Plaintiffs not thought to reach out to Mr. Gupta, however, Neil's deception might have successfully buried the truth from Plaintiffs and, ultimately, this Court.

Plaintiffs respectfully submit that the misconduct by Neil and Vasant merits severe sanctions, including but not limited to: (i) a mandatory jury instruction that Neil and Vasant forged the signature of each of the Sham Signers for the purpose of concealing Vasant's involvement; (ii) a mandatory jury instruction that Neil sent every email at issue from the SWilliams@romuluscap.com email address and falsely represented himself as "Sarah Williams" with the intent to deceive Plaintiffs; and (iii) an Order precluding the Romulus Defendants and Transferors from filing motions for summary judgment that rely upon the forged Transfer Agreements. Nothing short of these sanctions is sufficient to remedy the prejudice to Plaintiffs from the purposeful destruction of critical evidence and the willful obstruction of this case. Nor is anything short of these sanctions appropriate to hold the Romulus Defendants and Transferors accountable for their brazen disregard for the integrity of this judicial proceeding and the authority of this Court.

## RELEVANT BACKGROUND

This federal securities fraud action arises from ten transactions between August 2019 and November 2020 involving the purchase and sale of LP Interests in Romulus EquipmentShare

Growth L.P. ("Series A Fund"), a special purpose vehicle ("SPV") that holds shares of Series A-1 preferred stock in construction technology company EquipmentShare, Inc. ("EquipmentShare"). In five of those transactions, the Transferors purchased LP Interests in the Series A Fund from original limited partners that subscribed to the Series A Fund at inception ("Original LPs"). The Transferors paid the Original LPs a total of $3,725,000 for those LP Interests. The Transferors then sold those LP Interests to Plaintiffs – *often just days or weeks after purchasing them* – in five other transactions for a total sum of $44,000,000. Vasant was only able to capture that staggering profit of more than $40 million on his $3.7 million investment because Neil falsely represented to Plaintiffs that: (i) the Transferors were Original LPs; (ii) that purchased their LP Interests based on a $102 million valuation of EquipmentShare; and (iii) offered to sell those LP Interests to Plaintiffs based on a multiple of that $102 million valuation. In fact, Neil applied the multiple to the amounts Vasant paid to purchase LP Interests from Original LPs, which already reflected a multiple of 6-7 times the original purchase price. The Romulus Defendants and Transferors carefully concealed those transactions so that Plaintiffs believed, as Neil and Vasant intended, that the Transferors were Original LPs that purchased their LP Interests at the $102 million Series A valuation.

*The Chhedas' Fraudulent Scheme*

Neil and Vasant succeeded in defrauding Plaintiffs through a deliberate, carefully orchestrated scheme that employed a combination of misdirection, outright deception, and, as Plaintiffs recently learned, forgery. First, Vasant met Plaintiffs and piqued their interest by touting the remarkable growth of EquipmentShare and the corresponding success of investments his son Neil had made in it for Romulus.[2] Neil then exploited his position as a director of EquipmentShare

[2] Declaration of Daniel C. Mazanec in Support of Plaintiffs' Motion for Sanctions for Fraud on the Court ("Mazanec Dec.") at ¶ 2, **Exhibit 1**, Transcript of Deposition of Julian Jung ("Jung Tr."), at 27:23-28:7

to establish his credibility and falsely promised Plaintiffs an opportunity to participate in an upcoming EquipmentShare primary securities issuance to cement Plaintiffs' interest.[3]

While Neil and Vasant were working to stoke Plaintiffs' interest in EquipmentShare, Neil contacted Original LPs in the Series A Fund with a fabricated story of an "opportunity for liquidity" associated with the purported upcoming EquipmentShare primary. Neil used that false narrative as a pretext to arrange transactions for Vasant to purchase the Original LPs' LP Interests for six to seven times the amount the Original LPs paid to subscribe to the Series A Fund. Neil made these representations knowing Plaintiffs were willing to pay the Original LPs twice the amount Vasant offered. Once Vasant acquired those LP Interests, he quickly sold them to Plaintiffs in transactions Neil simultaneously arranged and orchestrated. But those transactions differed markedly from the transactions Neil arranged and facilitated between the Original LPs and the Transferors because, unbeknownst to Plaintiffs and directly contrary to Neil's false representations, the Transferors were ***not*** Original LPs that acquired their LP Interests in 2016 at prices corresponding to the $102,050,000 Series A valuation of EquipmentShare.

The Defendants employed a combination of intra-contractual and extra-contractual misrepresentations to defraud Plaintiffs in each of the five transactions that are the subject of this case. The Romulus Defendants and Transferors both falsely represented the subscription amount corresponding to the transferred LP Interest in each of the seventeen Transfer Agreements executed by the Transferors and Plaintiffs.[4] In addition, the Romulus Defendants made false representations in emails in connection with each of the five transactions between the Transferors and Plaintiffs. While there are subtle variations in those communications, they were all false

[3] *Id*. at ¶ 3, **Exhibit 2**, Transcript of Deposition of Boris Revsin ("Revsin Tr."), at 165:17-166:19.

[4] Of the twenty-one Transfer Agreements at issue, the other five were between the Original LPs and the Transferors.

representations that the Transferors were Original LPs that acquired the LP Interests they offered to sell Plaintiffs at the Series A pricing, corresponding to a $102,050,000 valuation of EquipmentShare. Those false representations were pivotal because, as the Romulus Defendants knew, Plaintiffs' primary focus in deciding whether to purchase a particular LP Interest in the Series A Fund was the corresponding enterprise value of EquipmentShare implied by the proposed price.[5] By falsely representing the subscription amounts, falsely representing that the Transferors were Original LPs, and concealing Vasant's involvement, the Romulus Defendants and Transferors ensured that Neil and Vasant raked in tens of millions of dollars at Plaintiffs' expense.

*Neil and Vasant Conceal Vasant's Involvement in the Transactions*

Neil and Vasant went to remarkable lengths to ensure that none of the Original LPs and Plaintiffs had any idea that Vasant was the sole ultimate beneficial owner of all three Transferors. Vasant used the three Transferor entities with distinct and unrelated names, which allowed Neil to identify the prospective buyer or seller to Plaintiffs and the Original LPs as only "Athena2, Inc.," "SNC 1, LLC," or "Apollo 1, Inc." Despite being the principal of the general partner of the Series A Fund, Neil did not disclose Vasant's involvement in any of the ten transactions to any of the Original LPs or Plaintiffs.[6] Likewise, Vasant admitted that he did not communicate with any of the Original LPs or Plaintiffs regarding any of the ten transactions, although he was regularly communicating with Julian Jung from Republic Labs from the end of June 2019 all the way into early 2021.[7] Indeed, when Julian wrote to Vasant on November 4, 2019 about the "big deal"

---

[5] Revsin Tr. at 151:20-152:6.

[6] *Id.* at ¶ 4, **Exhibit 3**, Transcript of Deposition of Neil Chheda ("NC Tr."), at 150:24-151:20 (Athena 2); 261:8-19 (SNC 1).

[7] *Id.* at ¶¶ 5-6. **Exhibit 4**, Transcript of September 19, 2025 Deposition of Vasant Chheda ("VC I Tr."), at 56:2-9, 89:17-92:18, 124:7-126:4, 161:6-15, **Exhibit 5**, APOLLO_002841 (Nov. 4, 2019 email from Julian Jung to Vasant Chheda).

Republic had just closed with Neil, Vasant responded but did not mention that he just happened to be the seller in that transaction:[8]

**From:** Vasant Chheda <vchheda@gmail.com>
**Sent:** Tuesday, November 5, 2019 4:58 PM
**To:** Julian Jung <julian@republiclabs.co>
**Subject:** Re: Lets catch up soon!

Dear Julian,

Good to hear from you. Traveling to India soon and I'll be back by last week of November. Let's catch up then.

> On Nov 4, 2019, at 2:52 PM, Julian Jung <julian@republiclabs.co> wrote:
>
> We just did a big deal with your son. Neil is the man!
>
> --
> Julian Jung
> Managing Director Republic Labs
> www.republiclabs.co

Signing the Transfer Agreements presented an obvious problem for Neil and Vasant's fraudulent scheme, however, because Vasant is the sole owner, director, and officer of each of the Transferors.[9] Accordingly, as Vasant testified at his deposition, he allegedly asked the Sham Signers—relatives and a family friend in India—to sign on behalf of the Transferors. Because of that, Vasant's name does not appear on any one of the twenty-one Transfer Agreements.

*Neil and Vasant Forge the Transferors' Signatures on Each of the 21 Transfer Agreements*

While Plaintiffs have alleged from the inception of this case that Neil and Vasant intentionally concealed Vasant's ownership of the Transferors, Plaintiffs only learned in recent

[8] *Id*. at Exhibit 5.
[9] Mazanec Dec. at ¶ 7, **Exhibit 6**, Transcript of Deposition of October 6, 2025 Deposition of Vasant Chheda ("VC II Tr."), at 54:10-20 (Athena 2), 57:26 (SNC 1), 76:18-23 (Apollo1).

depositions that Neil and Vasant actually forged the signatures of the Sham Signers on all twenty-one Transfer Agreements. Their testimony and the documents they produced do not permit any other conclusion.

To start, neither Neil nor Vasant could offer any plausible explanation why the Sham Signers, who had no connection whatsoever to the Transferors, signed the Transfer Agreements instead of Vasant, the sole owner, officer, and director of the Transferors. At his first deposition on September 19, 2025, Vasant testified that he "may" have asked the Sham Signers to execute the Transfer Agreements because his vision was "getting bad."[10] Then, at his second deposition on October 6, 2025, Vasant testified that he asked the Sham Signers to sign because it is his "routine practice to involve [his] family members in things that [he does]" so that his family members "feel included" in his business dealings.[11] Vasant did not mention anything about a desire to make his relatives in India "feel included" at his first deposition. And, although he testified that this was his "routine practice," he could not identify a single other instance where he had appointed a family member as an "authorized person" to sign legal documents.[12] Nor could Neil.[13] Neil also testified that he had "no idea" why Vasant asked the Sham Signers to sign the Transfer Agreements, but vehemently denied that the reason for this otherwise inexplicable maneuver was to conceal Vasant's involvement in the transactions.[14]

Vasant was certainly capable of signing the Transfer Agreements himself, as evidenced by his admission that he signed two Transfer Agreements on December 11, 2020 to transfer LP Interests in Romulus Capital II U.S. Feeder LP and Romulus Capital III U.S. Feeder LP from

---

[10] VC I Tr. at 110:8-111:18.
[11] VC II Tr. at 81:17-82:16; 106:21-107:7.
[12] *Id*. at 82:2-6; 86:7-89:21.
[13] NC Tr. at 221:21-223:20.
[14] NC Tr. at 192:22-193:21; 212:14-22; 252:21-253:4 288:13-289:14; 301:11-14.

Athena2, Inc. ("Athena 2") to his own name.[15] In fact, he testified in his second deposition that he signed those two Transfer Agreements himself precisely because those transactions did not involve any "outsider[s]" like Plaintiffs or the Original LPs, so it was "more easy" in that circumstance for him to sign, "rather than getting an authorized person involved at that stage."[16]

Concealing Vasant's involvement is the only plausible reason for the Sham Signers to sign the Transfer Agreements instead of Vasant. None of the Sham Signers have any relationship to the Transferors or the transactions that are the subject of this case.[17] None of them have any equity in any of the Transferors.[18] None of them are employees, contractors, directors, or officers of the Transferors.[19] No documents exist memorializing Vasant's purported appointment of the Sham Signers as "authorized persons" to sign the Transfer Agreements.[20] No documents exist showing that the Sham Signers had ever even heard about Romulus, EquipmentShare, the Series A Fund, or anything else relevant to this case.

Neil and Vasant's testimony about the Sham Signers themselves does not add any plausibility to their spurious story about the execution of the Transfer Agreements. Pushpa Shah is Vasant's sister-in-law.[21] She lives in India, does not use email, and has no experience with venture capital investments.[22] Dhiraj Shah is Pushpa's husband and Vasant's brother-in-law.[23] He also lives in India, does not use email, and has no experience with venture capital investments.[24] Moreover, according to Neil and Vasant, Dhiraj also goes by the name Dhiraj Dedhia, which they

---

[15] VC II Tr. at 195:3-196:5; Mazanec Dec. at ¶ 15, **Exhibit 11**, APOLLO_000642-49 (December 11, 2020 email from Vasant Chheda to Standish Management including Transfer Agreements signed in wet ink).
[16] *Id*. at 196:6-198:6.
[17] *Id*. at 27:23-28:7; 41:13-21; 55:8-10; 56:9-11; 57:12-14; 73:21-78:11; 183:16-20; 186:1-5; 236:22-237:2
[18] *Id*. at 55:8-10; 56:9-11; 57:12-14.
[19] *Id*. at 73:21-78:11.
[20] *Id*. at 27:23-28:7; 41:13-21; 183:16-20; 186:1-5.
[21] VC Tr. I at 38:13-39:2.
[22] *Id*. at 39:5-6; VC Tr. II at 29:22-30:2; 30:23-31:19; 85:9-86:6.
[23] VC Tr. I at 40:16-24.
[24] VC Tr. I at 113:22-114:10; VC Tr. II at 45:16-18; 85:9-86:6.

claim he used to sign some of the Transfer Agreements.[25] Hitendra Dedhia is Vasant's deceased brother-in-law, and neither Neil nor Vasant could identify when he died beyond saying it was "a few years ago."[26] While he was alive, Hitendra likewise lived in India and did not use email.[27] Finally, Dhaval Lalan is a "family friend" of Vasant's deceased mother.[28] Vasant does not have a phone number or email for Mr. Lalan, cannot recall the last time he spoke to Mr. Lalan, and was unable to locate Mr. Lalan to speak with him in preparing to testify at his second deposition on October 6.[29] Neil has never even spoken to Mr. Lalan, let alone met him.[30]

Most importantly, however, Neil and Vasant could not explain *how* they sent the Transfer Agreements to the Sham Signers in India, or *how* the Sham Signers returned the executed Transfer Agreements.[31] Their lack of any concrete memory or a single document showing how any of the Sham Signers actually signed any of the twenty-one separate Transfer Agreements worth tens of millions of dollars (resulting in over $40 million in profit and an investment return of over 10x in a matter of days or weeks) is patently incredible, especially because some of the signatures are electronic and some are in wet ink. Vasant testified that the Sham Signers do not use email.[32] Neither the Romulus Defendants nor the Transferors produced any text messages, WhatsApp messages, fax confirmations, or documentation showing delivery by Federal Express, UPS, DHL,

[25] VC Tr. at 120:10-18; NC Tr. at 259:8-9.
[26] VC II Tr. at 78:12-19; NC Tr. at 278:5-9.
[27] VC II Tr. at 79:11-14; 233:16-18.
[28] *Id*. at 90:5-91:4.
[29] *Id*. at 89:22-91:11.
[30] NC Tr. at 288:13-22.
[31] NC Tr. at 204:5-205:6 (Pushpa Shah electronic signature); 207:24-209:1 (Pushpa Shah wet signature); 259:8-261:7 (Dhiraj Shah); 272:11-273:7 (Dhiraj Dedhia aka Dhiraj Shah); 278:15-279:4 (Hitendra Dedhia); 287:20-290:21 (Dhaval Lalan); VC II Tr. at 136:20-137:9 (Puspha Shah electronic signature); 139:24-141:23 (Pushpa Shah wet signature); 157:15-160:3 (Dhiraj Shah); 165:7-168:15; 171:22-172:8; 177:14-178:9; 179:12-180:19; 191:11-193:3 (Dhiraj Dedhia aka Dhiraj Shah); 183:12-184:18 (Hitendra Dedhia); 185:16-191:6 (Dhaval Lalan).
[32] VC Tr. II at 233:16-18.

or any other global carrier.[33] Nor are there any emails or electronically stored information ("ESI") evidencing the use of DocuSign or any other electronic signing software or platform for the Transfer Agreements bearing the Sham Signers' electronic signatures.[34] The following table summarizes the ten transactions, twenty-one Transfer Agreements, and complete lack of documentary evidence to support the Defendants' story about the Sham Signers:

| Transaction | Purported Signor for Transferors | Signatures | Documents Showing *Who* Signed | Documents Showing Transmission to or from Purported Signor |
|---|---|---|---|---|
| Shippee → Athena2 | Unknown | Unknown | None | None |
| Athena2 → Republic | Pushpa Shah | Wet (2)[35] Electronic (3) | None | None |
| Belz → SNC1 | Dhiraj Shah | Wet (1) | None | None |
| Groveman → SNC1 | Dhiraj Shah | Wet (1) | None | None |
| SNC1 → Republic | Dhiraj Dedhia | Electronic (5)[36] | None | None |
| SNC1 → Republic | Dhiraj Dedhia | Electronic (2) | None | None |
| Al Bader → SNC1 | Dhiraj Dedhia | Electronic (1) | None | None |
| Al Bader → Apollo1 | Hitendra Dedhia | Electronic (1) | None | None |
| SNC1 → Republic | Dhiraj Dedhia | Electronic (1) | None | None |
| Apollo1 → | Dhaval Lalan | Wet (4) | None | None |

[33] See *id*. at 231:16-234:4; NC Tr. at 204:5-205:6; 207:24-209:1; 259:8-261:7; 272:11-273:7; 278:15-279:4; 287:20-290:21.

[34] *Id*.

[35] The Romulus Defendants produced two emails from Vasant Chheda to Neil Chheda attaching two of the three Transfer Agreements for this transaction with the wet-ink signature from "Pushpa Shah." Neil did not send either of these agreements to Plaintiffs because he received them a few hours after he sent Republic three fully executed Transfer Agreements with the purported electronical signatures of Pushpa Shah. *See* Mazanec Dec. at ¶¶ 22, 25-26, **Exhibit 18**, ROMULUS_00031215-57 (September 21, 2019 email from Neil Chheda to Boris Revsin, Julian Jung and Brian Johnson), **Exhibit 21**, ROMULUS_00028547-60, and **Exhibit 22,** Romulus 28860-73 (September 21, 2019 emails from Vasant Chheda to Neil Chheda).

[36] The reason there are five Transfer Agreements for this transaction is that one of the four original Transfer Agreements contained a mistake and was corrected a few weeks after closing, at which time Neil purportedly procured another signature from Dhiraj Dedhia (aka Dhiraj Shah). *See* Mazanec Dec. at ¶¶ 16-17, **Exhibit 12**, ROMULUS_00015064-65 (November 18, 2019 email from Neil Chheda to Brian Johnson requesting PDF copy of Transfer Agreement for "Dhiraj" that Neil could "get . . . executed in a few hours." ), **Exhibit 13**, ROMULUS_00028979-92 (November 18, 2019 email from Neil Chheda to Brian Johnson including fully executed agreement).

| | | | | |
|---|---|---|---|---|
| Republic | | | | |

The documents produced by the Defendants tell a different story altogether. Specifically, documents relating to the signing of the three Transfer Agreements for the transaction between Plaintiffs and Athena 2 in September 2019 demonstrate that Neil and Vasant conspired to forge the signature of Pushpa Shah on those three agreements and did, in fact, forge both her electronic and wet ink signature. At 3:20 p.m. on September 20, 2019, Neil emailed Brian Johnson at Republic and informed him that the DocuSign envelope for the Transfer Agreement mistakenly assigned Neil to sign "for Athena 2."[37] Neil asked Brian to leave the Athena 2 signature block "open" so he could have "Pushpa from Athena" sign.[38]

Between 6:03 and 6:22 p.m., Neil and Vasant exchanged the following text messages:[39]

NC Neil Chheda <+15166039357> 9/20/2019, 6:03 PM
Trust me, do exactly what I'm telling you to do.

V Vasant <+15169871235> 9/20/2019, 6:07 PM
Ok

V Vasant <+15169871235> 9/20/2019, 6:08 PM
I printed two documents.
The third one, which is the smallest ( one or two page ) does not open.
Can you resend it?

NC Neil Chheda <+15166039357> 9/20/2019, 6:08 PM
Resending you the three documents.

NC Neil Chheda <+15166039357> 9/20/2019, 6:16 PM
Taking off. Email me signed docs

V Vasant <+15169871235> 9/20/2019, 6:22 PM
Ok

[37] *Id*. at 190:6-194:15; Mazanec Dec. at ¶ 18, **Exhibit 14**, ROMULUS_00040757-78 (September 20, 2019 email from Neil Chheda to Brian Johnson).

[38] *Id*.

[39] Mazanec Dec. at ¶ 19, **Exhibit 15,** ROMULUS_00017891-92 (September 20, 2019 text message exchange between Neil Chheda and Vasant Chheda).

At his first deposition, Vasant testified that he understood Neil's message to "trust" him and "do exactly what I'm telling you to do" as referring to assisting Vasant with his "visual difficulties" to identify what pages required signatures.[40] Yet, after being confronted with evidence showing that he was able to properly identify and sign other Transfer Agreements himself, Vasant changed his story.[41] In his second deposition, Vasant claimed that Neil's message referred to an instruction of where Pushpa Shah should sign.[42]

At 6:08 p.m., Neil sent an email from his personal Gmail account to Vasant, writing in the subject line "print and execute these documents seperatey [sic] by Pushpa Shah."[43] Six hours later, shortly after midnight on September 21, 2019, Neil escalated the urgency. He emailed Vasant and his mother, Shobha Chheda, with the subject line "Urgent," attaching transfer agreements that at that point did not bear a signature for Athena 2.[44]

At approximately 2:47 a.m., Neil sent an email to Republic with copies of the transfer agreements labeled "executed," each showing an electronic signature of "Pushpa Shah" in Athena 2's signature block.[45] Neil was not able to explain how he obtained the electronically signed agreements he sent to Republic. He testified that he does not recall whether he received them on his phone or laptop, through which channel or application, or from whom:

> Q: So you – as you sit here today, as the corporate representative of the GP, and yourself individually, it's your testimony under oath that you do not know how you got the signed – the agreements signed by Pushpa Shah back so that you could send them on to Republic?

---

[40] VC I Tr. at 60:14-62:5

[41] *Id*. at 65:22-66:11

[42] VC II Tr. at 118:1-122:9.

[43] NC Tr. at 194:16-195:14, Mazanec Dec. at ¶ 20, **Exhibit 16**, ROMULUS_00028939-78 (September 20, 2021 email from Neil Chheda to Vasant Chheda).

[44] NC Tr. at 198:13-199:6, Mazanec Dec. at ¶ 21, **Exhibit 17**, ROMULUS_00031258-85 (September 21, 2021 email from Neil Chheda to Vasant and Shobha Chheda).

[45] NC Tr. at 202:8-203:24, Mazanec Dec. at ¶ 22, **Exhibit 18**, ROMULUS_00031215-57 (September 21, 2019 email from Neil Chheda to Boris Revsin, Julian Jung and Brian Johnson).

A: Yeah. I did – I went back and I looked. I tried my best to find where, and I – I don't know.[46]

One minute after sending the "executed" agreements to Republic with the purported electronic signatures of Pushpa Shah, Neil texted Vasant "never mind."[47]

Meanwhile, about five hours later, at 7:34am, Vasant emailed Neil scans of two[48] of the three transfer agreements with a wet-ink signature from "Pushpa Shah" in Athena 2's signature block.[49] Neil testified that he did not know how Vasant obtained the wet ink signature from Pushpa Shah sometime between midnight and 7:30 a.m. despite the fact that she resided in India and, according to Vasant, did not use email.[50] When asked whether Vasant forged her signature, Neil said "I don't think so," but admitted he never asked.[51] Vasant, for his part, testified that he has no record of where the wet-signed originals are, no record of how the signed pages were transmitted to him, and no record of how he or anyone else transmitted them onward.[52] Unsurprisingly, Vasant never provided Plaintiffs copies of the wet signature versions of the Transfer Agreements, so Plaintiffs did not even know there were two different sets of Transfer Agreements purportedly signed by Pushpa Shah until the Romulus Defendants produced them in discovery this summer.

Pushpa Shah's purported use of both electronic and wet ink signatures to sign these Transfer Agreements on behalf of Athena 2, Inc. is not the only curious difference between the

[46] NC Tr. at 204:22-205:6.

[47] NC Tr. at 205:16-22, Mazanec Dec. at ¶ 23, **Exhibit 19**, ROMULUS_00017893-94 (September 21, 2019 text message from Neil Chheda to Vasant Chheda).

[48] Although Vasant sent a text message to Neil Chheda at 7:49 am that he sent Neil "three signed documents" Defendant produced only two emails from Vasant to Neil containing two of the three Transfer Agreements. *See* Mazanec Dec. at ¶ 24, **Exhibit 20**, ROMULUS_00017961-62 (September 21, 2019 text message from Vasant Chheda to Neil Chheda)

[49] NC Tr. at 207:8-208:9; VC II Tr. at 29:22-30:2; 31:9-19, **Exhibit 21**, ROMULUS_00028547-60, **Exhibit 22**, Romulus 28860-73 (September 21, 2019 emails from Vasant Chheda to Neil Chheda).

[50] NC Tr. at. at 207:24-208:2.

[51] *Id*. at 208:3-9.

[52] VC II Tr. at 139:24-141:23.

two sets of fully-executed documents. In the electronic version, Ms. Shah has the title "Member," while in the wet ink version, Ms. Shah has the title "Manager":[53]

TRANSFEROR:

Athena 2, Inc.

By: Pushpa Shah
Name: Pushpa Shah
Title: Member

TRANSFEROR:

Athena 2, Inc.

By: Pushpa Shah
Name: PUSHPA SHAH
Title: MANAGER

According to Vasant, both titles are false as Pushpa Shah was neither a member nor manager of Athena2, Inc., which is a corporation and not a limited liability company.[54] Neither Neil nor Vasant could explain this "mistake," which constitutes yet another false representation within the four corners of these Transfer Agreements.[55] The obvious explanation is that Neil forged Pushpa Shah's electronic signature sometime between midnight and 2:47 a.m. while Vasant was asleep, and then Vasant rushed to forge Pushpa Shah's signature by hand after he woke up that morning to the "Urgent" email from Neil. In their respective hurries to forge Ms. Shah's signature, Neil and Vasant each made up a different title for her.

The differences between the two sets of fully-executed Transfer Agreements for the transaction between Athena 2 and Republic, however, are not nearly as arresting as the striking

[53] *Compare* Mazanec Dec. at Exhibit 18 (Pushpa Shah's electronic signatures) *with* Mazanec Dec. at Exhibits 20 and 21 (Pushpa Shah's wet-ink signatures). Vasant testified that he did not appoint Ms. Shah as "Manager" of Athena 2, but did not ask her to re-sign with a "correct" title. VC II Tr. at 139:5-23. In fact, she had no title and no connection at all to Athena 2 or any other Transferor. VC II Tr. at 55:8-10 (Ms. Shah has no interest in Athena 2); *Id*. at 7:21-76:17(Athena 2 has no officers or directors other than Vasant and no employees that Vasant can recall).

[54] *See* VC II Tr. at 54:17-55:10; 138:16-139:23.

[55] *Id*. at 138:16-139:19; NC Tr. at 208:10-209:1.

similarity of Vasant's handwriting and the purported handwriting of Pushpa Shah, Dhiraj Shah, and Dhaval Lalan:[56]


TRANSFEREE:

SNC 1 LLC

By:
Name: DHIRAJ SHAH
Title: MANAGER

TRANSFEROR:

Athena 2, Inc.

By:
Name: PUSAPA SHAH
Title: MANAGER

TRANSFEROR:

Apollo1 Inc.

By:
Name: DHAVAL LALAN
Title: AUTHORIZED PERSON

Athena 2, Inc.

By:
Name: VASANT CHHEDA
Title: Owner, President

Of course, as with all records showing how any of the Sham Signers received, signed, or transmitted any of the Transfer Agreements, neither Neil nor Vasant could find the original, wet-signature copies of these Transfer Agreements.[57] Neil admitted under oath, however, that he previously had the original copies of the Transfer Agreements with Dhaval Lalan's purported wet ink signature in his possession:

Q: So at some point you had in your – your hand the original of what is now Exhibit 45?
A: I might -- I think, because this is from me to me. So I think I would have had -- I think so.
Q: And do you know where that original document is now?
A: Right now? I mean, I searched in my office for whatever I could in preparation, but I -- I don't know this specific one.
Q: So just -- just so we have a clear record, Mr. Chheda, you searched for it, but you were unable to find the original?
A: That's right.[58]

[56] Mazanec Dec. at ¶¶ 15, 24, 27-28, **Exhibit 23**, ROMULUS_00076552-60, ROMULUS_0015467 (executed signature page with Dhiraj Shah's wet-ink signature); Exhibit 20 at ROMULUS_00028560 (Pushpa Shah's wet-ink signature); **Exhibit 24**, ECF No. 23-11 at 11 (Dhaval Lalan's wet-ink signature); Exhibit 11 at APOLLO_0005648 (Vasant Chheda wet-ink signature).
[57] VC II Tr. at 140:24-141:23; 157:15-3; 158-21-160:3; 186:20-191:6; NC Tr. at 290:8-294:13.
[58] NC Tr. at 290:8-294:13.

This was one of the rare instances where documents produced in discovery actually corroborated Neil's testimony. The Romulus Defendants produced emails that Neil sent to himself with PDF files of the signature pages, consistent with Neil's testimony that he used an application on his iPhone to scan the original documents bearing Mr. Lalan's purported wet ink signature and emailed them to himself.[59]

*Neil and Vasant Intentionally Destroyed (or Withheld) Evidence of Their Forgery*

The Transferors signed twenty-one different Transfer Agreements across ten transactions—the five transactions to purchase LP Interests from the Original LPs and the five transactions to sell those LP Interests to Plaintiffs. Yet not a single page of the more than 10,000 documents Defendants produced in this case shows *who* actually signed the Transfer Agreements on behalf of the Transferors. Nor did the Romulus Defendants or Transferors produce a single document showing *how* any of the Sham Signers received the Transfer Agreements or transmitted a signed Transfer Agreement back to Neil or Vasant. Both Neil and Vasant testified that they searched but could not find a single document showing the transmission of a Transfer Agreement to or from any of the Sham Signers.[60] And, most importantly, Neil testified that although he had the wet ink original Transfer Agreements with Mr. Lalan's purported signature at some point in time, he was not able to find any of them.[61]

Neil and Vasant's testimony that they could not find a single document showing the transmission of any of the twenty-one Transfer Agreements to or from the Sham Signers is patently incredible on its own. When combined with the uncanny absence of any ESI for the electronic

[59] *Id*. at 287:5-294:13; Mazanec Dec. at ¶¶ 29-31, **Exhibit 25**, ROMULUS_00028525-35, **Exhibit 26**, ROMULUS_00028514-24, **Exhibit 27**, ROMULUS_00028536-46 (November 13, 2020 emails from Neil Chheda to himself attached scanned copies of Transfer Agreements).

[60] VC II Tr. at 231:16-233:7; NC Tr. at 204:5-21; 260:19-261:7; 278:24-279:2; 290:8-294:13.

[61] NC Tr. at 290:8-21; 292:23-293:2; 294:9-13.

signatures of the Sham Signers and the striking visual similarity among the handwriting of Vasant, Pushpa Shah, Dhiraj Shah, and Dhaval Lalan, there can be only one conclusion: Neil and Vasant forged the signatures of the Sham Signers on all twenty-one Transfer Agreements and destroyed the evidence of their forgery, including the original copies of the Transfer Agreements bearing the purported wet ink signature of Dhaval Lalan, which Neil admitted he once had in his physical possession.

*Neil and Romulus Maintain the Sarah Williams Ruse Throughout This Action*
*(Until They Learn That Plaintiffs Discovered the Truth)*

Plaintiffs alleged in their original complaint and First Amended Complaint ("FAC") that Romulus made specific fraudulent misrepresentations in emails sent by a person at Romulus named Sarah Williams, who used the email address swilliams@romuluscap.com.[62] For example, "Sarah Williams" sent the following email on October 10, 2019:

[62] ECF No. 1 at ¶¶ 59-64, 66-68, 84-85, 100-101, 117-118, 246, 249; ECF No. 90 at ¶¶ 53-58, 60-61, 79, 94-95, 111-112, 210-213.

Message

| | |
|---|---|
| **From:** | Sarah Williams [swilliams@romuluscap.com] |
| **Sent:** | 10/10/2019 10:25:36 AM |
| **To:** | Boris Revsin [boris@republiclabs.co] |
| **CC:** | Neil Chheda [nchheda@romuluscap.com] |
| **Subject:** | Re: EquipmentShare |
| **Attachments:** | 2019-02-06 Equipmentshare Cap Table.xls; Untitled attachment 00007.htm |

Dear Boris,

Good morning!

I am attaching the cap table for EquipmentShare to help answer your question.

1)16,960 shares of implies about 0.074% ownership of EquipmentShare. If you acquire such a stake for $1.2m, the implied post-money valuation is ~1.61B.

2) Romulus EquipmentShare Growth LP invested at a post money valuation of $102,500,000. Specifically, you are contemplating acquiring a limited partnership interest acquired for $675,000 in Romulus EquipmentShare Growth L.P., a Delaware limited partnership, for a total of $9,1000,000. [9,1000,000/675,000]*$102,500,000 = ~ 1.38B

Warm Regards,

Sarah

In their answer to the FAC, the Romulus Defendants "admitted" that "Sarah Williams, a former unpaid intern at Romulus," sent that email.[63] The Romulus Defendants repeated their characterization of Ms. Williams as a "former unpaid intern at Romulus" no fewer than **twenty-three times**.[64] Strangely, however, when the Romulus Defendants served their Rule 26 Initial Disclosures on April 29, 2024, they did not identify "Sarah Williams" as an individual likely to have discoverable information pursuant to Rule 26(a)(1)(A)(i).

In late April 2025, counsel for Plaintiffs and the Romulus Defendants conferred about preliminary scheduling for fact witness depositions. During that conference, Plaintiffs requested

[63] ECF No. 101 at ¶¶ 53, 210.
[64] *Id*. at ¶¶ 53-58, 60-61, 73, 78-79, 94-95, 97-98, 111-112, 114, 159, 210, 213, 220, 222.

contact information for Sarah Williams, the "former unpaid intern."[65] Counsel for the Romulus Defendants responded to that request by email on April 25, 2025, stating that:

> **Ms. Williams was an unpaid intern for Romulus**. Nobody from Romulus has been in touch with her since her internship concluded and does not have any current contact information for her.[66]

On April 29, Plaintiffs asked the Romulus Defendants to provide the *last known* contact information for Ms. Williams, as Plaintiffs had been unable to identify a "Sarah Williams" who worked as an intern at Romulus anywhere online, from LinkedIn, or from archived pages from the Romulus website.[67]

Counsel for Plaintiffs and the Romulus Defendants conferred again about Sarah Williams on a telephone conference on May 1, 2025.[68] During that call, counsel for the Romulus Defendants stated that Romulus did not directly engage Ms. Williams as an "unpaid intern," but instead procured her services through a "placement agency."[69] As a result, the Romulus Defendants claimed they had no contact information for Ms. Williams whatsoever.[70] Plaintiffs then asked the Romulus Defendants to provide contact information for the placement agency so that Plaintiffs could subpoena contact information for Ms. Williams directly from the agency.[71] Counsel for the Romulus Defendants agreed to look into the issue and provide whatever contact information Romulus had.[72]

Nearly two weeks later, the Romulus Defendants still had not advised Plaintiffs whether they had contact information for the placement agency that sourced Ms. Williams.[73] Accordingly,

---

[65] Mazanec Dec. at ¶ 8, **Exhibit 7** (April 22, 2025 email from Daniel Mazanec, Esq.).
[66] *Id*. at ¶ 8, Exhibit 7 (April 25, 2025 email from Michael Jones, Esq.) (emphasis added).
[67] *Id*. at ¶ 8, Exhibit 7 (April 29 email from Daniel Mazanec, Esq.)
[68] *Id*. at ¶ 9.
[69] *Id*.
[70] *Id*.
[71] *Id*. at ¶ 10.
[72] *Id*.
[73] *Id*.

Plaintiffs' counsel followed up with counsel for the Romulus Defendants on May 13 and reiterated the request.[74] The Romulus Defendants responded by letter on May 16, stating:

> In 2008, Anantshree Chaturvedi set up Romulus's website (https://romuluscap.com), email system, intern network, and hosting services. Certain email aliases ending with "@romuluscap.com" were created and access was provided to interns and offshore service providers arranged by Mr. Chaturvedi. Romulus does not have any personal or contact information for the people staffed by these offshore service providers and never paid them directly. Mr. Chheda joined Romulus in 2012 with those arrangements and protocols already in place.
>
> The email address swilliams@romuluscap.com was used by former interns and/or offshore service providers. This practice consolidated executive assistance functions into one client facing account. The email account is a user on Romulus's Google Workspace account, and thus Romulus has administrative control of the email account. This email address was used primarily for scheduling and sending documents to limited partners and portfolio companies.[75]

Beyond being very strange, this response was a dramatic departure from the Romulus Defendants' prior explanation that Ms. Williams was an "unpaid intern" for whom Romulus simply no longer had contact information, and persisted in not identifying *who* in fact used the email address allegedly used for "scheduling and sending documents to limited partners."

Due to the changing and confusing story about Sarah Williams from the Romulus Defendants which played out for over a year as Plaintiffs sought to find "Ms. Williams" and take her deposition, Plaintiffs contacted original Romulus founding partner Krishna Gupta through his counsel and inquired whether he could confirm the Romulus Defendants' latest explanation in their counsel's May 16 letter.[76] Mr. Gupta responded through his counsel and explained that **Neil Chheda is "Sarah Williams."**[77] As Mr. Gupta testified at his recent deposition:

> Q: So who is Sarah Williams in connection with Romulus?
> A: Um, **I believe there was no Sarah Williams**.
> Q: Okay.

---

[74] *Id*. at ¶ 11, **Exhibit 8**, May 13, 2025 email from Daniel Mazanec, Esq.
[75] *Id*. at ¶ 11, **Exhibit 9**, May 16, 2025 letter from Michael Jones, Esq.
[76] *Id*. at ¶ 12.
[77] *Id*. at ¶ 13.

A: **Sarah Williams was a fictitious email address created to handle administrative tasks** for Romulus just to create, you know, an alias, effectively. **It was managed by Neil Chheda**. In fact, he often interchanged his own email with Sarah's, or this person Sarah, and to my knowledge that email, because it was causing so much confusion where he accidentally would send e-mails under Sarah's name versus his name, he told me he was deleting the account I believe around 2016 or something like that. That's what I know about Sarah Williams.[78]

At his deposition on September 29, 2025, Neil admitted that in preparing for his deposition, he reviewed a Memorandum prepared by Plaintiffs' counsel for the United States Securities and Exchange Commission and produced in this case that discussed Neil's fabrication of Sarah Williams and Plaintiffs' discovery of the truth.[79] Recognizing that he could no longer perpetuate his lie that Sarah Williams was a "former, unpaid intern at Romulus," Neil instead provided purposefully vague, evasive, and often entirely unresponsive answers to questions about Sarah Williams and his use of the email address SWilliams@romuluscap.com. For example, when asked whether he sent the October 10, 2019 email from "Sarah Williams" with one of the specific fraudulent misrepresentations alleged in the FAC, Neil first testified that he could not recall because "Swilliams was used by multiple people."[80] He could not, however, identify a single other person who used the email address since 2019.[81] Neil's answer to the question whether he sent that October 10 email evolved to "I think I may have," and, eventually, "I think – yeah. That's right."[82] Despite that, when asked whether the Romulus Defendants falsely alleged in their answer that "Sarah Williams, a former unpaid intern at Romulus" sent the October 10 email, Neil testified as follows:

---

[78] *Id*. at ¶ 14, **Exhibit 10**, Transcript of Deposition of Krishna Gupta ("Gupta Tr.") at 37:10-38:2 (emphasis added).
[79] NC Tr. at 24:21-25:8.
[80] *Id*. at 42:23-45:2.
[81] *Id*. at 43:11-16.
[82] *Id*. at 56:6-10; 66:10-12.

Q: The question to you is, every time in the answer that you and the GP state that "Sarah Williams, a former unpaid intern at Romulus" sent an e-mail, that is, in fact, false, is it not?
A: I don't – I don't believe so.
Q: You can identify a Sarah Williams as you sit here today?
A: **Do I know someone called Sarah Williams? No.**
Q: Okay. Mr. Chheda, back to Exhibit 3. Why did you use the swilliams@romuluscap.com e-mail address to send that e-mail?
A: I don't know.[83]

In other words, in the midst of his effort to obstruct and obfuscate Plaintiffs' discovery, Neil admitted that Sarah Williams, the "former, unpaid intern," does not exist and never has. She is a fiction Neil created and used to distance himself from knowingly false representations he made to Plaintiffs to induce them to engage in transactions designed to enrich Vasant at Plaintiffs' expense.

## ARGUMENT

### I. The Exceptional Misconduct by Neil and Vasant Chheda Constitutes Fraud on the Court Because the Conduct is Unconscionable, Intended to Hamper Plaintiffs' Presentation of Their Case, and Intended to Interfere with the Court's Impartial Adjudication of the Action

"A 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989). The conduct of Neil and Vasant in this litigation has undeniably interfered with this Court's ability to impartially adjudicate the case and unfairly hampered Plaintiffs' ability to fairly present their claims. As the Supreme Court explained in *Chambers v. NASC, Inc.*, the inherent power of courts to appropriately address such fraud "is necessary to the integrity of the courts, for 'tampering with the administration of justice in [this] manner . . . involves far more than an injury to a single litigant. It is a wrong against the institutions

[83] *Id.* at 73:3-16 (emphasis added).

set up to protect and safeguard the public." 501 U.S. 32, 45 (1991) (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944)).

As the First Circuit observed in *Aoude*, district courts have the inherent power to do what is necessary to address conduct that stoops to the level of fraud on the court, conduct that constitutes abusive litigation practice, or where "a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." 892 F.2d at 1119. Where a district court finds a party has committed a fraud on the court, the court must examine a mix of factors to fashion a remedy with a reasonable relation to the conduct and the prejudice it caused to the other party. *Com. Of Puerto Rico v. SS Zoe Colocotroni,* 628 F.2d 652, 666 (1st Cir. 1980). In *Aoude,* for example, the court reviewed an order dismissing a plaintiff's case where the plaintiff had fabricated the agreement that was the basis of his lawsuit to inflate the purported purchase price. The plaintiff continued with the charade until a non-party witness partially exposed the truth, although the defendant did not discover the full extent of the fraud for another three months. At that point, after the cat was out of the bag, the plaintiff sought leave to amend his pleading to replace the fabricated agreement with the true one. The trial court dismissed the complaint as the sanction for the plaintiff's bad faith conduct and the First Circuit affirmed, finding that "[t]he only conceivable reason for [plaintiff's] elaborate duplicity was to gain an unfair advantage, first in the dispute, thereafter in the litigation." *Aoude,* 892 F.2d at 1118-19. The fraud, the court found, affected both the defense of the case and the court's ability to fairly adjudicate the case: "The tactic plainly hindered the defendant's ability to prepare and present its case, while simultaneously throwing a large monkey wrench into the judicial machinery." *Id.*[84]

[84] Because of the trial court's "intimate knowledge of the variables that enter into the equation, appellate review of sanctions orders is deferential." *Mulero-Abreu v. Puerto Rico Police Dept.*, 675 F.3d 88, 91 (1st Cir. 2012) (quoting *Jensen v. Frank*, 912 F.2d 517, 524 (1st Cir. 1990)).

The elaborate duplicity in the case before the Court is equally egregious. Defendants' conduct through Neil and Vasant has substantially hindered Plaintiffs' ability to fairly present their claims, caused substantial delay in the disposition of the case, and willfully deceived the Court with "conduct utterly inconsistent with the orderly administration of justice." *Id.* at 119. Their forgery of the central agreements in the case, their destruction or willful loss of the original agreements and related evidence, and the persistent deceit surrounding the true identity of Sarah Williams has, among many other things, prevented Plaintiffs from timely resolving dispositive motions, discovery disputes, legal arguments and certain claims and defenses at an early stage of the case.

In *Flava Works, Inc. v. Momient*, the district court considered a similar fraud on the court and determined that it warranted dismissal of the plaintiff's complaint because it was "the most egregious fraud on the court that this Court has encountered in 33 years on the bench," although the court gave the party an opportunity to defend its conduct and propose lesser sanctions ("this Court *anticipates* the dismissal of Flava's [pleadings] . . . with prejudice . . ."). Case No. 11 C 6306, 2013 WL 1629428, at *2-3 (N.D. Ill. Apr. 16, 2013) (emphasis added)). In *Flava Works*, the plaintiff alleged the existence of a purported agreement in its pleading but did not attach a copy of it. Based on the parties' respective allegations, that alleged agreement could have been dispositive of the claims and defenses asserted in the case. The district court ordered the plaintiff to produce the agreement and, after hearings and submissions by the parties, found that the alleged contract was "a skilled forgery" because the plaintiff had transposed an authentic signature from a different contract onto the "totally bogus document." *Id.* at *2; *see also Hull v. Municipality of San Juan,* 356 F.3d 98 (1st Cir. 2004) (affirming dismissal of complaint where personal injury plaintiff failed to disclose material prior injuries in response to interrogatories and questions at deposition, the

circumstances showed a broad pattern of deceit, and the plaintiff knew the information was material). As in *Flava Works*, the clear and convincing evidence submitted in support of this Motion compels a finding of fraud on this Court.

## II. No Remedy Short of An Adverse Jury Instruction Can Fully Redress The Fraud Neil and Vasant Have Committed in This Litigation Because the Fraud Has Obstructed and Interfered with the Lawful Disposition of this Action

Once the Court has established that Defendants committed a fraud on the Court, "[t]he next question, of course, requires that we examine the options of a federal district judge confronted by such odious machinations." *Aoude*, 892 F.2d at 1119. The Court's inherent power includes "the power to do what is necessary and proper to conduct judicial business in a satisfactory manner . . . [and] 'to process litigation to a just and equitable conclusion.'" *Id.* (quoting *HMG Property Investors, Inc. v. Parque Indus. Rio Canas, Inc.*, 847 F.2d 908, 916-17 (1st Cir. 1988)). The sanction the Court imposes should bear "a direct and reasonable relation to the prejudice defendants' irresponsible conduct had already created." *Com. Of Puerto Rico v. SS Zoe Colocotroni*, 628 F.2d 652, 666 (1st Cir. 1980) (citing 4A Moore's Federal Practice P 37.03(2.-1) at 37-56) (affirming the striking of defense pleadings where wrongdoers "gained a considerable strategic advantage by" misrepresenting until the eve of trial that they were admitting liability). "The judge must consider the proper mix of factors and juxtapose them reasonably." *Aoude*, 892 F.2d at 1117. Those factors include the prejudice accruing to Plaintiffs by reason of the fraud, "the centrality of the fraud to the matters at issue in the litigation[,]" the interference of the conduct with "the court's adjudicatory function," the public interest in the integrity of the judicial system and the need to deter similar conduct in the future. *Id.* at 1120 & n.3. Examination of those factors in this case confirms that nothing short of adverse jury instructions and precluding Defendants'

reliance on the forged Transfer Agreements in pretrial motions will suffice to remedy and punish the fraud.

**A. Plaintiffs have suffered extreme prejudice as a result of Neil and Vasant's conduct.**

Plaintiffs have been severely prejudiced in the presentation and prosecution of their claims because the myriad defenses and arguments based on the forged Transfer Agreements and Neil's impersonation of the fictional Sarah Williams could have and should have been disposed of long ago. Presumably, this Court and the First Circuit would have been interested in the forgeries, given Defendants' argument in their motions to dismiss and on interlocutory appeal to the First Circuit, was grounded in the non-reliance provision that only applies (if not barred by § 29 of the Exchange Act) to extra-contractual fraud, not outright fraud within the four corners of the Transfer Agreements.

Moreover, Plaintiffs have been hamstrung by Neil and Vasant's destruction (or intentional "loss") of the purported wet signature originals of the agreements. Had Defendants properly retained and produced that evidence, Plaintiffs' discovery of the forgery would have occurred much earlier and almost certainly resulted in an early disposition of the key defenses, not to mention Defendants' motions to dismiss, which hinged on the very Transfer Agreements Defendants forged. Nevertheless, all available circumstantial evidence indicates – beyond *any* reasonable doubt – that Neil and Vasant forged signatures of Sham Signers on the Transfer Agreements, which has obviously hindered Plaintiffs' ability to prepare and present their case.

The prejudice is compounded by Defendants' failure to preserve or produce any documents evidencing how the Sham Signers allegedly executed or sent any Transfer Agreements to Neil and Vasant. Of the twenty-one signatures from the Sham Signers, Defendants have provided only two instances of circumstantial evidence of their execution. The first is the implausible story

surrounding the two sets of three Transfer Agreements Pushpa Shah purportedly signed the same day. Although Neil emailed Vasant to "print and execute these documents seperatey [sic] by Pushpa Shah," Neil himself sent Republic copies of Transfer Agreements that same night executed with electronic signatures by Ms. Shah. Neil could not explain or provide documentation evidencing how he obtained Ms. Shah's electronic signature since she allegedly does not use email. Nor could Neil or Vasant explain why, the next morning, Vasant emailed Neil copies of the Transfer Agreements containing wet signatures from Pushpa Shah. The second instance is the remarkable circumstances surrounding the Transfer Agreements purportedly signed in wet ink by Dhaval Lalan that Neil scanned using an application on his iPhone and then emailed to himself. Neil could not explain how he came into possession of documents bearing Mr. Lalan's purported wet signature, despite never having met or spoken to Mr. Lalan. These examples are the only two instances where Defendants produced any semblance of evidence of the signing of the Transfer Agreements by the Sham Signers, and both instances strongly imply that Neil and Vasant forged these signatures. Defendants' failure to provide *any* documents supporting how the Sham Signers executed the other fourteen Transfer Agreements robs Plaintiffs of critical circumstantial evidence that would establish definitively that the Chhedas fabricated those signatures as well.

Similarly, the Sarah Williams charade Defendants launched at the outset of the case in their response to the Complaint has significantly hampered Plaintiffs' ability to prosecute their claims, protracted these proceedings, and interfered with this Court's ability to timely and fairly adjudicate this matter. The material false testimony appears in the Defendants' Answer and Defenses--false pleadings that they have never corrected, and in verified discovery responses that are, at best, intentionally evasive, if not outright fraudulent. It is beyond dispute that the identity of the person who made the misrepresentations to the Plaintiffs is a critical issues in the case, and had counsel

for Plaintiffs not had the presence of mind to contact Neil's former business partner to learn the true identity of Sarah Williams, Defendants would today still be benefitting materially from Neil's lie, to the further detriment of Plaintiffs and in affront to the integrity of this Court. The lie stated twenty-three times in the Answer and Defenses, continued in sworn discovery responses, the strange and inconsistent explanations from counsel to the Romulus Defendants, and the fact that Neil hid his identity behind the fictional "Sarah Williams" to author key fraudulent misrepresentations all demonstrate Neil's awareness that his conduct was wrongful, and that his deceit was deliberate. *See Hull*, 356 F.3d at 100 (scienter of plaintiff who omitted key evidence in sworn discovery and deposition responses inferred from the circumstances that the information was "squarely sought," the plaintiff had an "obvious self-interest" in hiding the information, there was a broader pattern of deceit, and the plaintiff knew the importance of the omitted information to his claims).

The Romulus Defendants misled Plaintiffs and the Court about Sarah Williams for more than a year, delaying exposure of the true author of four of the five key extracontractual fraudulent statements, impacting Plaintiffs' litigation strategy, and corrupting the integrity of the discovery process itself. While the combination of Plaintiffs' relentless diligence and Mr. Gupta's belated testimony ultimately exposed the truth, that came only after more than a year of work and at a substantial cost to Plaintiffs – an expense that Plaintiffs never would have incurred but for Neil's purposeful deception and utter disregard for the authority of this Court.

Collectively, these acts of forgery, spoliation, and deceit have substantially prejudiced Plaintiffs. Through their misconduct, Defendants denied Plaintiffs' the early disposition of

affirmative defenses,[85] deprived Plaintiffs of access to the most probative physical evidence of forgery, perpetuated the fiction that the Sham Signers actually signed the Transfer Agreements, and misled Plaintiffs and the Court about the true author of key extracontractual misrepresentations. Moreover, the Plaintiffs and this Court both expended substantial resources addressing motions to dismiss that were based solely and exclusively on the terms of the forged and fraudulent Transfer Agreements. Had the Defendants not falsely maintained the integrity of the Transfer Agreements, they could never have filed motions to dismiss that rested, entirely, on those forged documents. This Court certainly would not have expended the time and resources to seriously evaluate the Defendants' motions to dismiss had the Court known that Neil and Vasant forged the Transfer Agreements on which the Defendants' hinged. Those motions to dismiss also delayed, as Defendants obviously intended, the disposition of this lawsuit and the Plaintiffs' recovery of the substantial nine-figure damages they are owed. Only the imposition of meaningful sanctions can remedy the substantial harm to Plaintiffs and the brazen affront to the integrity of this Court.

Nor does Plaintiffs' fortuitous unraveling of the Sarah Williams lie and their discovery of the forgery of the signatures on the Transfer Agreements diminish or extinguish the fraud on the Court Defendants perpetrated. Neil Chheda's belated admission during his deposition that he "might" have used the Sarah Williams email account to send emails is too little too late to cure the fraud that has been ongoing since September 2019 or the fraud he has perpetrated on this Court since May 24, 2022 when he moved to dismiss Plaintiffs' complaint based on the terms of the Transfer Agreements he and Vasant forged. As the First Circuit explained in *Aoude*, "[t]he failure

[85] For example, the fact that Neil and Vasant forged the signatures on all twenty-one Transfer Agreements is immediately fatal to the Ninth, Sixteenth, and Thirtieth affirmative defenses asserted by the Romulus Defendants, among others. *See* ECF No. 71.

of a party's corrupt plan does not immunize the defrauder from the consequences of his misconduct." 892 F.2d at 1120; *see also Ayoubi v. Dart*, 640 Fed.Appx. 524, 527-28 (7th Cir. 2016) (affirming imposition of sanction against plaintiff who lied to the court and rejecting a belatedly asserted excuse, stating, "A 'newly advanced position,' crafted only to exonerate litigation misconduct, need not be believed.") (quoting *Mulero-Abreu v. P.R. Police Dep't*, 675 F.3d 88, 93 (1st Cir. 2012)).

**B. The forging of the Transfer Agreements, destruction of all related evidence, and the deceit about Sarah Williams are undeniably central to this litigation.**

The purported Transfer Agreements that Neil and Vasant forged have been the cornerstone of Defendants' defenses throughout this litigation. The significance of these forgeries cannot be overstated. As the Defendants know well, had Vasant signed the Transfer Agreements and thus alerted Republic to the fact that Vasant was involved in the transactions, Plaintiffs never would have done these deals. Among other things, Plaintiffs would have immediately asked why Vasant was offering to sell Plaintiffs LP Interests in the Series A Fund given that Vasant told Julian Jung only a couple months before that he "missed out" on investing in EquipmentShare through Romulus.

Concealing Vasant's role in the transactions is the only plausible reason that Neil and Vasant decided to forge the signatures of extended family members and friends in India who had no connection whatsoever to the Transferors. For more than three years, Defendants have relied on these forged agreements in filings with the Court, including their motions to dismiss, and in an appeal to the First Circuit. Like the forged contract in *Flava Works, Inc.*, the forged Transfer Agreements are central to this case because Defendants have argued from the inception of this case that the Transfer Agreements immunize them from liability for securities fraud.

The true identity of Sarah Williams and the fact that she was a fictional character Neil created and hid behind is also a central fact in this case. Plaintiffs must prove a material misrepresentation to prevail on their fraud claims, including their Exchange Act claims. The Romulus Defendants repeatedly and purposely misled Plaintiffs (and this Court) about "Sarah Williams" – *knowing Plaintiffs were trying to locate her and take her deposition* – because her fictional existence allowed Neil to claim, as he represented to this Court twenty-three separate times in his Answer, that someone else made the false representations Plaintiffs allege in this case. The Romulus Defendants' purposeful use of this fiction to gain an advantage in this case caused Plaintiffs to incur legal expenses on a true wild goose chase, but, more importantly, concealed powerful evidence of Neil's scienter that Plaintiffs would have used in responding to numerous consequential motions in this case, including the Romulus Defendants' Motion to Certify an Interlocutory Appeal and the Romulus Defendants' Petitions to the First Circuit. *See Hull*, 356 F.3d at 102.

**C. Defendants' egregious conduct interfered with the court's adjudicatory function and violated the public's interest in the integrity of the judicial system**.

The fraud on this Court that Neil and Vasant have perpetrated in this litigation is the sort of extreme misconduct that the First Circuit has previously held interferes with the courts' duty to efficiently and fairly adjudicate cases and constitutes an affront to the public's interest in the integrity of that system. *See Aoude*, 892 F.2d at 1118-19. It is obvious that allowing a party to benefit from deceitful (and illegal) conduct by forging documents, spoliating the originals, and then relying on those same forged documents for a defense would violate the public's interest in the integrity of the judicial system. Absent severe sanctions, there is good reason to expect that future litigants will attempt to follow Neil and Vasant's playbook, by hiding the truth behind forged documents that were purportedly signed by people halfway around the globe that are impossible

to locate, let alone procure for a deposition. *See Pearson v. First NH Mortg. Corp.*, 200 F.3d 30, 42 n.7 (1st Cir. 1999) ("The nature of any [ ] sanction [for fraud on the court] should be determined with a view to its deterrent value, not necessarily limited to the harm caused litigants."); *Lask v. Rhee-Karn*, No. 24-CV-2666 (MMG) (RWL), 2025 WL 1983441, at *16 (S.D.N.Y. May 6, 2025) ("An objective of sanctions pursuant to . . . the court's inherent authority [to find fraud on the court] is deterrence.").

**I. Mandatory jury instructions and a prohibition on Defendants relying on the forged agreements is directly related to the fraud on the court and the prejudice Plaintiffs and the judicial system have suffered as a result**

The district court has "inherent power to do what is necessary and proper to conduct judicial business in a satisfactory manner" and "to deter abuse of the judicial process." *Aoude*, 892 F.2d at 1119. What is "necessary and proper" can include anything from dismissal, in the most egregious cases, to adverse jury instructions and the inability of a guilty party to use the fruits of its deceit. *See, e.g.*, *Aoude*, 892 F.2d at 1119-20 (affirming dismissal); *Com. Of Puerto Rico v. SS Zoe Colocotroni*, 628 F.2d 652, 663-666 (1st Cir. 1980) (holding defendants to their earlier admission of liability and striking their pleadings on the issue of liability). In light of Defendants' bad faith and willful conduct through Neil and Vasant, Plaintiffs request that the Court enter an Order: (i) establishing a mandatory jury instruction that Neil and Vasant jointly forged the signature of each of the Sham Signers on all Transfer Agreements for the purpose of concealing Vasant's involvement in the five transactions that are the subject of this case; (ii) establishing a mandatory jury instruction that Neil sent every email from the SWilliams@romuluscap.com email address and falsely represented himself as "Sarah Williams" with intent to deceive Plaintiffs; (iii) precluding the Romulus Defendants and Transferors from filing motions for summary judgment pursuant to Rule 56 that rely upon the forged Transfer Agreements. *See ConsumerDirect, Inc. v. Pentius, LLC*, No. 8:21-cv-01968-JVS (ADS), 2023 WL 8876198, at *7 (C.D. Cal. Sept. 21, 2023)

("If the Court can dismiss a case for fraud on the court under its inherent authority, then the Court can issue a less drastic sanction, such as an adverse inference instruction, for similar conduct.").

The requested mandatory jury instruction and the preclusion of the Defendants from relying on the forged Transfer Agreements in pretrial summary judgment or other motions bear "a direct and reasonable relation to the prejudice [D]efendants' irresponsible conduct has already created." *SS Zoe Colocotroni*, 628 F.2d at 666. In *SS Zoe Colocotroni*, the First Circuit reviewed an order sanctioning bad faith pretrial discovery conduct under Rule 37, which permits orders designating facts as established; precluding the disobedient party from supporting or opposing designated defenses or from introducing specified evidence; or striking pleadings or parts of pleadings. *See id.* at 663. All these are also available to this Court under the Court's inherent power to address litigation misconduct, which includes "the ability to do whatever is reasonably necessary to deter abuse of the judicial process." *Aoude*, 892 F.2d at 1119 (quoting *Eash v. Wiggins Trucking Inc.*, 757 F.2d 557, 567 (3d Cir. 1985)); *see also ConsumerDirect, Inc.*, 2023 WL 8876198, at *7 ("Pursuant to its inherent authority, '[a] district court may, among other things, dismiss a case in its entirety, bar witnesses, exclude other evidence, award attorneys' fees, or assess fines.'").

Similarly, the requested mandatory jury instruction regarding the Sarah Williams deceit directly addresses and is narrowly tailored to meet the misconduct and is proportional to the bad faith behavior. *See Fashion House, Inc. v. K mart Corp.*, 892 F.2d 1076, 1081-82 (1st Cir. 1989). In *Fashion House*, the First Circuit reviewed very similar deceit and delay in discovery and upheld the district court's sanction. The defense in that case had dragged its feet and flip-flopped in its position regarding the availability of certain information that was key to the plaintiff's damages case. The court found "the desired information was within defendant's ken" and that "defendant

was intent on obstructing, rather than facilitating, the discovery process" and "acted willfully and in bad faith." *Id.* at 1082. As in *Fashion House*, Neil repeatedly hid the truth over many months, flip-flopped his position, and outright lied in sworn discovery responses and in Defendants' Answer. That easily meets the level of bad faith and willful conduct. And as in *Fashion House*, the truth that Neil strove so hard to hide is central to Plaintiffs' claims and was clearly within his knowledge. Had it not been for counsel's diligence in reaching out to a third party to inquire, the truth would have never been known and Neil would have succeeded in his deceit.

In *Fashion House*, the court sanctioned the defendant's misconduct by ordering that a jury would determine the relevant damage number using a formula and precluding the defendant from introducing evidence of the amount of that item in its damages case. The First Circuit found that remedy to be just and "specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Id.* at 1081. Likewise, a mandatory instruction that the jury must find that Neil sent every email from the Sarah Williams account is clearly and narrowly tailored to the misconduct in hiding that crucial fact from Plaintiffs and the Court. Given Neil's testimony at his deposition that he "might" have sent the key emails from that address, and the other objection evidence, it is almost certain that an evidentiary hearing to determine whether Neil intentionally hid the truth will conclusively establish the point. And that instruction directly addresses the bad faith and willful conduct.

## **CONCLUSION**

From the start of this case, the Romulus Defendants and Transferors have argued that the Transfer Agreements immunize them from any liability for their fraud. The Transferors attached the Transfer Agreements to their motion to dismiss and, along with the Romulus Defendants, relied almost exclusively on those Transfer Agreements in their briefing and the two days of oral

argument before this Court. We now know that Neil and Vasant forged each one of those Transfer Agreements. We also now know that Neil made up the fake person "Sarah Williams" to distance himself from fraudulent representations he made to Plaintiffs. But neither of these deceptions ended with the fraudulent transactions. Both have been central to Defendants' strategies in this case, with Defendants relying on the forged Transfer Agreements in numerous motions filed with this Court and two petitions filed with the First Circuit. The Romulus Defendants have also relied on the Sarah Williams ruse to misdirect Plaintiffs in discovery, as recently as June 23, 2025 when they falsely represented in sworn interrogatory responses that "they lack specific personal knowledge regarding the preparation of the so-called October 10 Williams Email." Defendants' pattern of deliberate fraudulent conduct throughout this case has severely prejudiced Plaintiffs. It is also a direct and shameless assault on the integrity of this proceeding and an affront to the authority of this Court. It should not – and cannot – go unpunished.

Plaintiffs respectfully request that this Court enter an Order: (i) requiring a mandatory jury instruction that Neil and Vasant jointly forged the signature of each of the Sham Signers on all Transfer Agreements for the purpose of concealing Vasant's involvement in the five transactions that are the subject of this case; (ii) requiring a mandatory jury instruction that Neil sent every email from the SWilliams@romuluscap.com email address and falsely represented himself as "Sarah Williams" with intent to deceive Plaintiffs; (iii) precluding the Romulus Defendants and Transferors from filing motions for summary judgment pursuant to Rule 56 that rely upon the forged Transfer Agreements; (iv) awarding Plaintiffs their reasonable attorneys' fees and costs incurred in connection with this Motion and requiring Defendants, jointly and severally, to pay Plaintiffs' reasonable attorneys' fees and costs incurred in connection with this Motion; and (v)

awarding any further relief in favor of Plaintiffs or against Defendants that the Court deems just and proper.

Dated: October 31, 2025

Respectfully submitted,

*/s/ Daniel C. Mazanec*

Daniel C. Mazanec (*admitted pro hac*)
Florida Bar No.: 88737
Christina Mastrucci (*admitted pro hac*)
Florida Bar No.: 113013
Manuel M. Ferro (*admitted pro hac*)
Florida Bar No.: 1025396
PAG.LAW, PLLC
1441 Brickell Avenue, Suite 1120
Miami, FL 33131
Office Phone: 786.292.1599
dan@pag.law
manuel@pag.law

Steven W. Kasten, BBO # 559576
Dalton & Finegold, LLP
125 High Street, High St. Tower Suite 405
Boston, MA 02110
(617) 371-1050
skasten@dfllp.com

*Counsel for Plaintiffs*

## LOCAL RULE 37.1 CERTIFICATION

I hereby certify that counsel for Plaintiffs conferred in good faith with counsel for Defendants regarding the relief sought in this Motion, and that Defendants have indicated that they oppose said relief.

*/s/ Daniel C. Mazanec*
Daniel C. Mazanec

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 31, 2025.

*/s/ Daniel C. Mazanec*
Daniel C. Mazanec